IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**GERALD ULIBARRI,**

    Plaintiff,

v.                                                        **No: 1:16-cv-215-RB-JHR**

**SOUTHLAND ROYALTY COMPANY, LLC,**

    Defendant.

## **MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiff Gerald Ulibarri's Motion for Leave to File a Second Amended Class Action Complaint. (Doc. 60.) Having reviewed the submissions of counsel and relevant law, the Court will **grant** Plaintiff's Motion and allow Plaintiff until **January 16, 2019**, to file his Second Amended Class Action Complaint.

**I.**     **Background**

This case originally reached the Court in March 2016, when Defendant Southland removed Mr. Ulibarri's original class action complaint. (Doc. 1 at 1.) The original complaint alleged breach of contract, breach of implied duty to market, and violations of the New Mexico Oil and Gas Proceeds Payment Act. (Doc. 1-1 at 8–12.) The claims were based on allegations that Southland had been underpaying royalties to leaseholders by improperly deducting from their royalty payments proportionate shares of: (1) the New Mexico Natural Gas Processor's Tax, and (2) the post-production costs of processing and otherwise making natural gas marketable for sale. (*Id.* at 5–8.) In July 2016, the Court denied Plaintiff's motion to certify dispositive questions on these two issues to the New Mexico Supreme Court. (Doc. 25.) The matter was stayed pending the resolution of *Anderson Living Trust v. Energen Resources Corp.*, a Tenth Circuit case addressing

nearly identical issues and many of the same lease agreements. *See* 879 F.3d 1088 (10th Cir. 2018), *amended and superseded on reh'g*, 886 F.3d 826 (10th Cir. 2018). (*See also* Doc. 30.) In early 2018, the Tenth Circuit resolved *Energen*,[1] holding that production companies *can* pass along to leaseholders a proportionate share of the Natural Gas Processors Tax. 886 F.3d at 831. In addition, the court held that the "marketable condition rule" does not apply in New Mexico—meaning Energen *can* "deduct[] from [leaseholders'] royalty payments their proportionate share of post-production costs—those costs necessary to make the gas marketable." *Id.*

Following the decision in *Energen*, Plaintiff filed his First Amended Complaint, which made two significant changes to the definition of the proposed class and his claims against Southland. (Doc. 41.) First, Plaintiff excluded from the proposed class definition any individuals or entities whose lease agreements provide for royalty payments based on "market value at the well," "the prevailing field market price," or any other agreement language stating that value should be calculated "at the well." (*Id.* at 1.) This change was based on Plaintiff's belief that the holding in *Energen* narrowly applies to only certain types of leases, and thus allows the deduction of post-production costs only insofar as that deduction is necessary to calculate the value of the gas "at the well." (*See* Doc. 37 at 2–3.)

The Tenth Circuit explained in *Energen* that natural gas is not marketable when it is first produced (i.e., "at the well"). *See* 886 F.3d at 832. Thus, when a lease agreement calls for royalties to be calculated based on the value of the gas at the well, producers must determine this value using a "netback" or "workback" method of calculation. *See id* at 832–33. This involves calculating a price for the natural gas "at the well" by selling the natural gas after it has been

---

[1] The superseding version of the Tenth Circuit's opinion published on March 2, 2018, simply removed a footnote from its January 9, 2018 opinion and clarified how Energen sells the gas it produces. *See Anderson Living Tr. v. Energen Res. Corp.*, 886 F.3d 826, 829 (10th Cir. 2018). The portions of the opinion the Court cites here are the same in both the January and March versions.

processed into marketable condition, then deducting the post-production costs that were necessary to prepare it for sale to actually earn that value. *See id.* at 832 (explaining that the leases in *Energen* "set the basis for royalty payments as the 'market value at the well' or the 'prevailing field market price.' Determining those amounts, however, is not straightforward, because Energen does not sell the gas it produces on these leased properties 'at the well'" (internal citations omitted).) Plaintiff's First Amended Complaint thus asserts that while *Energen* dictates that the deduction of post-production costs is allowed when the lease requires calculating "at the well" value for natural gas, it is still improper to deduct post-production costs from the royalties paid under all those leases that don't require calculations of value "at the well." (*See* Docs. 37 at 2–3; 41 at 4–6.)

Plaintiff's First Amended Complaint also alleges that Defendant has improperly calculated royalty payments for the class members by not basing payments on the actual sale proceeds of the natural gas and related products derived from their wells. (Doc. 41 at 6.) "After treatment and processing, the gas which came from the Class members' wells is converted into residue gas, natural gas liquids[,] and condensate, [which] are then sold to third party purchasers." (*Id.* at 5.) Plaintiff alleges that Defendant significantly underpays royalties on the sale of such products, in contravention of the class members' lease agreements. (*Id.* at 6.) The First Amended Complaint summarizes Plaintiff's current breach of contract claims this way:

> Southland has breached the applicable Royalty Agreements by engaging in a common method of royalty accounting which: (1) calculates a value for the royalties which are paid to Plaintiff and the Class members that is substantially less than the sale proceeds received on the sale of gas, including residue gas, the natural gas liquid products, and condensate, which came from Plaintiff's and the Class members' Southland Wells; and (2) improperly deducts costs for gathering, compression, processing, NGPT, natural gas liquids transportation and fractionation, and other costs and expenses.

*Id.* Defendant did not object to Plaintiff amending his complaint to reflect these new allegations and class definitions. (Doc. 38 at 1.)

On October 5, 2018, Plaintiff filed a Motion for Leave to File a Second Amended Class Action Complaint. (Doc. 60.) The proposed amendments would only change the definition of the putative class, not the substantive allegations or claims for relief. (*See id.* at 2–3.) First, Plaintiff seeks to include in the class all royalty owners holding two new types of leases, claiming the language in these new leases' royalty provisions also prohibits deducting post-production costs and reveals that Defendant is underpaying royalties based on its calculation method. (*See id.*) Second, Plaintiff seeks to remove one type of lease agreement from the proposed class definition, as further discovery revealed that "Southland does not hold the lessee's interest in any New Mexico oil and gas lease which has this royalty provision." (*Id.* at 2.) Finally, Plaintiff seeks to add White River Royalties, LLC as a named plaintiff. (*Id.* at 3–4.) White River Royalties, LLC holds an oil and gas lease with Southland that includes an identical royalty provision to those in Plaintiff's leases (a "Proceeds" provision, as explained below). (*Id.* at 3.)

Plaintiff's proposed class in its Second Amended Complaint would include any individual or entity holding a lease with Southland since January 1, 2015, that contains one of four different types of royalty payment provisions:[2]

(1) **"Proceeds" Royalty Provision**: Requires payment of "a specified percentage of the proceeds of the gas, as such, for gas from wells where gas only is found."[3] (*Id.* at 5.)

(2) **"Gross Proceeds" Royalty Provision**: Requires payment of "a specified percentage of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found." (*Id.*)

---

[2] Plaintiff has given each type of royalty provision a short title, which Defendant also adopted in its Response for ease of reference. (*See, e.g.*, Doc. 66 at 1 (describing White River Royalties, LLC's lease as having a "'proceeds royalty provision,' as that term has been previously defined").) The Court will do the same, while noting that these are not official terms for different types of royalty provisions, nor do these specific labels appear in the leases.

[3] Internal quotation marks are omitted from this definition and those that follow. In Plaintiff's proposed Second Amended Complaint, he appears to quote examples of such language in relevant leases. (*See* Doc. 60 at 5–6.)

(3) **"Greater of Market Value or Gross Proceeds" Royalty Provision**: Requires payment of "a percentage of the greater of (i) the market value of the product sold or used in a condition acceptable for delivery to a transmission pipeline, or (ii) the gross proceeds received by Lessee upon arms length sale of such as conditioned for delivery to a transmission pipeline." (*Id.* at 5–6.)

(4) **"Gross Proceeds without Deduction of Post-Production Costs" Royalty Provision**: Requires payment of "a specified percentage of the gross proceeds without deduction from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter associated with marketing gas produced from the lands covered hereunder." (*Id.* at 6.)

Defendant does not oppose adding White River Royalties, LLC as a named plaintiff or removing the type of lease provision that does not apply to its lease interests. (*See* Doc. 66 at 1.) Defendant does, however, oppose adding the "Greater of Market Value or Gross Proceeds" and "Gross Proceeds without Deduction of Post-Production Costs" Royalty Provisions (the new royalty provisions) to the Complaint, asserting that Plaintiff's claims pursuant to such leases are moot. (*Id.* at 1–2.) "Although an actual controversy exists with respect to the proper interpretation of the 'proceeds royalty provision' and the 'gross proceeds royalty provision,' no such controversy exists with respect to the [new royalty provisions] . . . ." (*Id.* at 3.)

This is so, according to Defendant, because it "agrees that deductions are not permitted under the [new royalty provisions] under the circumstances," and consequently identified 18 lessors with such leases who currently receive royalties from Defendant. (*Id.*) Defendant "adjusted its payment calculation going forward to exempt their interests from deduction of post-production costs[,] . . . is [] in the process of determining the amount of back royalties that are due[,] . . . [and]

5

will be contacting these royalty owners to explain the payments they will be receiving." (*Id.* (citing Doc. 66-1, Affidavit of Justin Ram ¶¶ 3–7).) Defendant asserts that these steps render "any justiciable issues that might exist with respect to the royalty owners subject to [the new royalty provisions] . . . moot." (*Id.* at 3.) Thus, as "[c]ourts do not have subject matter jurisdiction over moot claims," the amendments would be subject to dismissal and are futile. (*See id.* at 2 (citing *Keller Tank Servs. II, Inc. v. Comm'r of Internal Revenue*, 854 F.3d 1178, 1193 (10th Cir. 2017).)

Plaintiff disagrees, countering that Defendant's Response does not adequately explain how it will calculate such royalties going forward, what post-production deductions it has been and will cease making, or which leaseholders will receive back payments and in what amount. (*See* Doc. 70 at 4–5.) Further, Defendant's Response does not address the second major claim in the lawsuit that applies to all four types of lease provisions in the proposed class—the claim that Defendant is improperly calculating royalties on residue gas, natural gas liquids, and condensate and failing to pay royalties based on actual sales proceeds. (*See id.* at 9.)

## II. Standards of Review

### A. Motion to Amend

Under Federal Rule of Civil Procedure 15, a party may amend its pleading once as a matter of course in limited circumstances, and otherwise may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 directs courts to "freely give leave when justice so requires." *Id.* Liberally allowing leave to amend ensures "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982) (citation omitted). However, leave to amend may be properly denied for reasons including "bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In the Tenth Circuit, "[a] proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999).

### B. Mootness and Voluntary Cessation

Claims may be subject to dismissal if the plaintiff lacks standing under Article III of the United States Constitution, which empowers federal courts to hear only those claims grounded in actual cases or controversies. *See* U.S. Const. art. III § 2. A claim that is moot must be dismissed for lack of standing. *See Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) ("Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction" (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir.1996))). A claim is moot if "the relief sought can no longer be given or is no longer needed." *Unified Sch. Dist. No. 259, Sedgwick Cty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1150 (10th Cir. 2007) (quotation omitted). The defendant bears the burden of proving that an issue is moot. *See WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012) (citing *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221 (2000)).

"The defendant's burden is even greater when the defendant moots the case by voluntarily ceasing its offending conduct." *Id.* The "voluntary cessation" exception provides that a defendant may not render an issue moot simply by choosing to desist from some activity which it could freely take up again once the litigation has ended. *See Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008) (noting that "this exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the
7

illegal conduct"). However, a defendant's voluntary action may moot an issue if it meets two requirements: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115–16 (10th Cir. 2010) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)) (quotation marks omitted).

Meeting these requirements is a "formidable burden," which "will typically be met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence of the challenged conduct." *Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)); *see also ARW Expl. Corp. v. Aguirre*, 947 F.2d 450, 453 (10th Cir. 1991) (explaining that in claims for declaratory relief "[t]he party contending the case is moot has a heavy burden of demonstrating that there is no reasonable expectation the conduct will be repeated").

### III. Analysis

Defendant's Response does not contain enough factual information to moot Plaintiff's claims regarding the new royalty provisions, and Plaintiff's amendments will thus be allowed because "justice so requires." *See* Fed. R. Civ. P. 15(a)(2). First, Defendant has not addressed Plaintiff's claim that, notwithstanding the post-production deductions, it has been miscalculating and underpaying royalties for natural gas residue, liquids, and condensate under all four types of royalty provisions. Second, Defendant has not met its heavy burden of proving its actions satisfy the required conditions for mootness based on voluntary cessation. *See Tandy*, 380 F.3d at 1291.

Plaintiff's First Amended Complaint includes allegations that, in addition to improperly deducting post-production costs from royalty payments, Defendant relies on a method of

calculating royalties that results in payment of "substantially less" royalties than it is obligated to pay under the leases. (Doc. 41 at 6.) This allegation is distinct from the allegation that Defendant also improperly deducts post-production costs from royalty payments. (*See id.*) Defendant did not object to this amendment. (*See* Doc. 38 at 1.) Thus, it is perplexing that Defendant does not explain how its decision to cease post-production deductions renders *both* claims regarding the new royalty provisions moot. Indeed, because this case has not yet reached the merits, it is unclear whether Defendant's method of calculating royalties for all the relevant lease provisions is proper under the contracts, and, if not, what remedy Defendant owes the royalty owners. The Court does not find this issue moot, even if Defendant ceases making post-production cost deductions.

Further, even if the improper deduction of post-production costs was the only claim at issue, Defendant has not explicitly argued that, in regard to the new royalty provisions, "there is no reasonable expectation that the alleged violation will recur," and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *See Rio Grande Silvery Minnow*, 601 F.3d at 1115. In addition to not arguing that it has met these conditions, Defendant has offered the Court very little evidence to draw such a conclusion on its own. (*See* Doc. 66.) Defendant concedes that the language in the new royalty provisions prohibits it from deducting post-production costs from such royalty payments. (*Id.* at 3.) Defendant also acknowledges that it had been improperly deducting such costs until approximately October 2018. (*See id.*) However, beyond stating that it "identified 18 lessors with interest in these leases who are currently royalty owners" and has "adjusted its payment calculation going forward to exempt their interests from deduction of post-production costs," Defendant has not explained how these changes guarantee that the improper conduct cannot occur again and its effects are eradicated. (*See id.* at 3.)

9

Two Tenth Circuit cases in which defendants successfully met the high burden of proving mootness based on voluntary cessation are instructive. In *Rio Grande Silvery Minnow*, the court held that the plaintiff environmental groups' claim for declaratory relief was moot because the basis of their claim—that the federal government failed to conduct adequate consultations before issuing two biological opinions—had been extinguished when the biological opinions were superseded. 601 F.3d at 1118 (the defendant federal agency met the heavy burden of showing that a voluntary action rendered the issue moot because it "took the concrete step in 2003 of issuing a new biological opinion . . . [which] superseded and rendered obsolete the two biological opinions that provided the framework for the [plaintiffs'] challenge").

Similarly, in *WildEarth Guardians v. Public Service Co. of Colorado*, the Tenth Circuit found that the defendant's voluntary compliance with the Clean Air Act in constructing its coal plant mooted plaintiff's claims. 690 F.3d at 1186–88. Applying the voluntary cessation test, the court found that the defendant had adequately shown that its alleged violation of the Clean Air Act—building a coal plant without obtaining a "MACT" regulatory determination—"could not reasonably be expected to recur." *Id.* at 1186. The Court relied on several factors in reaching this conclusion, including that regulatory standards had changed definitively in the interim so there was no chance the defendant could again violate the now-superseded MACT determination requirement. *Id.* The court explained, however, that: "This case is a rare exception. Under the unusual circumstances present here, *Laidlaw's* 'absolutely clear' standard is met . . . . [I]f [plaintiff] constructs a new coal plant in the future, it will no longer be subject to the case-by-case MACT determination provisions that [defendant] alleges were violated in this case." *Id.* at 1186–87.

Unlike the definitive examples of mootness in *Rio Grande Silvery Minnow* and *WildEarth Guardians*, where the defendants provided evidence of changed circumstances that clearly

10

prevented future violations, here there is no certainty that the post-production cost deduction issue has been fully resolved. *See Rio Grande Silvery Minnow*, 601 F.3d at 1118; *WildEarth Guardians*, 690 F.3d at 1186–88. Neither Plaintiff, the leaseholders, nor the Court can be assured that Defendant has identified all the leaseholders affected by improper post-production cost deductions under the new royalty provisions. Indeed, Defendant's own answers to interrogatories show that its investigation to identify members of the putative class "revealed a number of duplicate leases on the same properties, some of which have apparently expired . . . [and] Southland's hard copy document and image files may not be complete." (Doc. 70-2 at 3.) Defendant even stated that it "does not have records that enable it to segregate the royalty owners whose leases fall within the Subject Leases from those royalty owners whose leases do not." (*Id.*) Defendant has not elaborated on the process it subsequently used to identify the 18 leaseholders it now claims are subject to the new royalty provisions. (*See* Doc. 66 at 3.) It has thus not adequately assuaged the possibility that future investigations might reveal additional leaseholders that are subject to such royalty provisions and have been improperly compensated.

Similarly, Defendant has provided no details about the process it is using to determine the underpayments made to these 18 leaseholders, the mechanisms it will implement to ensure underpayment does not occur in the future, or the process by which it will begin to determine what royalties it owes as backpay. (*See id.*) Defendant cites various cases in which courts have held that a defendant may make settlement offers to non-represented potential class members, as well as cases holding that a claim may be mooted prior to class certification when a plaintiff "accept[s] payment in full for the judgment entered in his favor" or has "settl[ed] all claims with the defendant." (*See id.* at 4 (collecting cases); citing *Barreras v. Travelers Home & Marine Ins. Co.*, No. 12-354 KG/SCY, 2014 WL 12523771 (D.N.M. Dec. 9, 2014); *Clark v. State Farm Mut. Auto.*

11

*Ins. Co.*, 590 F.3d 1134 (10th Cir. 2009) (quotation omitted.) However, Plaintiff is correct that here, "there is absolutely no evidence that Ulibarri, White River Royalties, LLC, or the eighteen proposed Class members have resolved their claims with Southland." (Doc. 70 at 7.) Rather, Defendant has simply asserted that it will voluntarily cease post-production deductions. (Doc. 66 at 3.) At the time of filing its opposition to the motion to amend, Defendant had not yet even contacted the 18 leaseholders it claimed would be affected by the change. (*Id.*)

Defendant's actions in identifying relevant leaseholders and seeking to remedy the post-production cost issue are positive, and will likely help this case proceed more smoothly as the issues unfold. Still, these actions are simply not equivalent to a formal settlement agreement under which the Court could be satisfied that "there is no reasonable expectation that the alleged violation will recur," and "interim relief or events have completely and irrevocably eradicated the effects" of the violation. *See Rio Grande Silvery Minnow*, 601 F.3d at 1115. Plaintiff has timely moved to amend his complaint based on new evidence uncovered during discovery, and does not seek to amend the substantive claims against Defendant. Allowing him to broaden the proposed class definition will not unduly burden or prejudice Defendant in preparing its defense, and Plaintiff's claims as they relate to the new proposed class definition are not moot.

**THEREFORE**,

**IT IS ORDERED** that Plaintiff's Motion for Leave to File a Second Amended Class Action Complaint (Doc. 60) is **GRANTED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE