# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**GERALD ULIBARRI and**
**WHITE RIVER ROYALTIES, LLC,**

      Plaintiffs,

v.                                                                            **No: 1:16-cv-215-RB-JHR**

**SOUTHLAND ROYALTY COMPANY,**
**LLC,**

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

In this dispute over the calculation of royalty payments for natural gas produced under certain oil and gas leases, Gerald Ulibarri and White River Royalties, LLC (Plaintiffs) allege that Defendant Southland Royalty Company, LLC (Southland) employs a method of calculating royalty payments that violates their lease agreements. Before considering this contract interpretation dispute, however, the Court must rule on Plaintiffs' motion to certify their proposed class. Plaintiffs argue that there are hundreds of individuals and entities with interests in oil and gas lease agreements that are similarly breached every time Southland deducts certain post-production costs from their royalty payments. Southland counters that determining whether an individual's royalty payment is correctly calculated requires an individualized assessment of each lease and the relevant wells and market conditions.

Southland has proffered an expert witness, Kris Terry, to opine on the customs, practices, usage of terms, and historical context that inform lease provisions in the oil and gas industry. Plaintiffs argue that her expert testimony amounts to no more than legal conclusions and impermissible opinions on contract interpretation that are not relevant to class certification issues. Plaintiffs urge the Court to exclude the entirety of her testimony from an upcoming class

certification hearing and the Court's consideration of the certification issue. Having considered the submissions of the parties, the record, and relevant law, the Court will **deny** Plaintiffs' motion to exclude Ms. Terry's expert testimony from the class certification hearing.

**I. Background**[1]

**A. The Underlying Complaint and Proposed Class**

Southland produces natural gas from various "gas only" wells in New Mexico. (Doc. 99 at 3.) Southland produces this gas and related natural gas products pursuant to the lessee's interest it holds in numerous oil and gas lease agreements that it acquired through assignment from Energen Resources Corporation on January 1, 2015. (*See id.*; *see also* Doc. 106 at 11.) These lease agreements contain provisions providing that individuals and entities holding the lessor's interest shall be paid royalties on natural gas production. (*See* Doc. 99 at 3.) Production, treatment, and processing of natural gas yields natural gas residue, natural gas liquids, and condensate. (*Id.* at 7 ("[a]fter treatment and processing, the gas . . . is converted into residue gas, natural gas liquids and condensate, [which] are then sold to third party purchasers").) The named plaintiffs have lessor's interests in several lease agreements under which Southland produces natural gas. (*Id.* at 3–4.)

Plaintiffs allege that Southland has improperly calculated their royalty payments by not basing payments on the actual sale proceeds of the natural gas products derived from their wells. (*Id.*) Instead, they argue, Southland consistently deducts post-production costs like treatment (which removes impurities from residue gas to make it marketable) and processing (which separates out natural gas liquid products to make them available for sale) from their royalty payments. (*See* Doc. 106 at 2.) Plaintiffs allege that, pursuant to their lease agreement language, such "post-production" costs should not be deducted from royalty payments, which are meant to

---

[1] The Court recites only the factual and procedural background necessary to resolve this motion.

be calculated solely on gross profits and not adjusted for the cost of post-production processing. (*Id.*) Plaintiffs thus allege that Southland significantly underpays royalties for the sale of natural gas liquids and residue gas, and are seeking damages in the amount of the underpayments plus interest, as well as a declaratory judgment that Southland must calculate royalties without the deduction of post-production costs. (*See* Docs. 106 at 2; 113 at 1–2.)

Plaintiffs seek to bring this action on behalf of a putative class including all individuals and entities who have been paid royalties by Southland at any time since January 1, 2015, and hold a lessor's interest in a lease agreement that contains one of four different types of royalty payment provisions.[2] The royalty provisions relevant to the proposed class include:

(1) **Proceeds Royalty Provisions**: Require payment of "a specified percentage of the proceeds of the gas, as such, for gas from wells where gas only is found."[3] (Doc. 99 at 1.)

(2) **Gross Proceeds Royalty Provisions**: Require payment of "a specified percentage of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found." (*Id.*)

(3) **Greater of Market Value or Gross Proceeds Royalty Provisions**: Require payment of "a percentage of the greater of (i) the market value of the product sold or used in a condition acceptable for delivery to a transmission pipeline, or (ii) the gross proceeds received by Lessee upon arm[']s length sale of such as conditioned for delivery to a transmission pipeline." (*Id.*)

---

[2] Plaintiffs have given each type of royalty provision a short title, which Southland has also adopted for ease of reference. (*See, e.g.*, Doc. 66 at 1 (describing White River Royalties, LLC's lease as having a "'proceeds royalty provision,' as that term has been previously defined").) The Court will do the same, while noting that these are not official terms for different types of royalty provisions, nor do these specific labels appear in the leases.

[3] Internal quotation marks are omitted from this definition and those that follow. Plaintiffs' definition quotes examples of the relevant language in the subject leases. (*See* Doc. 99.)

(4) **"Gross Proceeds without Deduction of Post-Production Costs" Royalty Provisions**:

> Require payment of "a specified percentage of the gross proceeds without deduction from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter associated with marketing gas produced from the lands covered hereunder." (*Id.* at 1–2.)

The proposed class definition excludes any individuals or entities who receive royalties from Southland pursuant to lease language stating that royalties should be calculated "at the well" or by "prevailing field market price." (*Id.* at 2.) The definition also excludes "any person or entity who has been a working interest owner in a well located in New Mexico on whose behalf Southland paid royalties on natural gas produced by Southland in New Mexico." (*Id.*)

### B. Kris Terry's Proffered Expert Testimony

Asserting that this proposed class meets the class certification requirements under Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiffs have moved to certify their putative class. (Doc. 105.) The question of certification has not yet been fully briefed, and the Court will hear arguments on the certification issue at an upcoming hearing. Plaintiffs move the Court to exclude all of the proposed expert testimony of Kris Terry, who Southland has retained to provide her opinions "as an expert in the oil and gas industry concerning the usage of terms, the customs and practices of the oil and gas industry, and the historical context and circumstances that have, over time, informed the understanding of the parties to oil and gas agreements." (Doc. 113-6 ¶ 4; *see also* Doc. 113.) Plaintiffs argue that Ms. Terry's proffered testimony is comprised of inadmissible opinions regarding contract interpretation of the four types of royalty provisions at issue, "purports to opine on a question of law[,]" and encroaches on the Court's role in deciding whether the proposed class is properly ascertainable. (Doc. 113 at 4–7.) Southland counters that Ms. Terry's four expert

4

opinions are all "reliable opinions that will assist the Court in making its class certification determination" (Doc. 130 at 1), and "Plaintiffs' disagreement with the opinion[s] is not in any way dispositive as to [their] admissibility." (*Id.* at 9.)

## II. Legal Standards

### A. Legal Standard for the Admission of Expert Testimony

As part of its evidentiary gatekeeping function under Federal Rule of Evidence 702, the Court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (extending the *Daubert* standard for evaluating scientific expert testimony to "technical" and "other specialized" knowledge). This requires a two-step inquiry, first determining whether the proffered expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *103 Inv'rs I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting Fed. R. Evid. 702). Second, the Court must determine whether the proposed testimony "is sufficiently 'relevant to the task at hand[,]'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 597), and has "a reliable basis in the knowledge and experience of [the expert's] discipline[,]" *Daubert*, 509 U.S. at 592.

Federal Rule of Evidence 702 codifies the elements laid out in *Daubert* and *Kumho Tire Co.* that are required to meet the second prong of the Court's gatekeeping inquiry—relevance and reliability. Rule 702 provides that a qualified expert witness may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

5

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592–97; *Kumho Tire Co.*, 526 U.S. at 141–42.

Evidence is relevant if it "has any tendency" to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Under Rule 702, reports from experts . . . are admissible only if necessary to aid in the interpretation of scientific, technical, or other specialized facts[,]" *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 889 (10th Cir. 2006), but "[d]oubts about whether an expert's testimony will be useful 'should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.'" *Robinson v. Mo. Pac. R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (quoting J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 702[02], p. 702–30 (1988) (internal citations omitted)). The Court has "wide latitude . . . in exercising its discretion to admit or exclude expert testimony[,]" *Bitler*, 400 F.3d at 1232, and in a bench trial, "while *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise . . . ." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (citation omitted).

### B. Legal Standard for Class Certification

As Ms. Terry's expert testimony is being proffered and challenged here solely as it relates to the upcoming class certification hearing, a brief summary of the legal standard for determining class certification is relevant to the admissibility of Ms. Terry's testimony for this purpose. The party seeking class certification bears the burden of "affirmatively demonstrat[ing] . . . compliance" with each required element in Rule 23, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011), subject to "a strict burden of proof," *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988) (citing *Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 435 (10th Cir. 1978)). However, in conducting its "rigorous analysis" of whether the class satisfies the certification requirements, "the

6

court must accept the substantive allegations of the complaint as true." *Shook v. El Paso Cty.*, 386 F.3d 963, 968 (10th Cir. 2004) (citations omitted).

All parties seeking class treatment must show that the class meets four prerequisites: (1) numerosity rendering joinder impracticable, (2) commonality of questions of law and fact, (3) typicality of the class members' claims and defenses, and (4) adequacy of the named party to represent the entire class. *See* Fed. R. Civ. P. 23(a). Next, the party must show that the class meets the requirements of one of the three specific types of class action listed under Rule 23(b). Plaintiffs bring their motion for class certification under Rule 23(b)(3), which is proper when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

Finally, though not listed as an explicit requirement under Rule 23, an important element of class certification is that the potential members of the class can be objectively and easily ascertained. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ("a plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable'" (quoting *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012))). "A class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017), *reh'g denied* (Oct. 4, 2017), *cert. denied*, 138 S. Ct. 2026 (2018) (citations omitted).

## III. Analysis

### A. Ms. Terry is qualified as an expert in the oil and gas industry.

As a threshold matter, the Court finds that Ms. Terry is qualified to offer her opinions on the customs and practices, usage of terms, and historical context and circumstances in the oil and

7

gas industry that have developed to shape common understanding of oil and gas agreements. (*See* Doc. 130 at 3–5.) Ms. Terry's curriculum vitae and summarized experience in the oil and gas industry demonstrate that she is qualified by "knowledge, skill, experience, training, or education" to render an opinion on aspects of the oil and gas industry that will be relevant to the class certification hearing. (*See* Docs. 134-1; 134-2.) *See also* Fed. R. Evid. 702. Ms. Terry is an oil and gas consultant with "more than thirty years of experience in the oil and gas industry, including seven years as a manager in the gas and administration and gas marketing divisions of Fina Oil and Chemical Company." (Doc. 130 at 4.) As a consultant, Ms. Terry assists clients in marketing and transporting natural gas, and consults "on oil and gas accounting and royalty payment matters." (Doc. 134-2 at 1.)

Evidence and arguments presented at the class certification hearing will assist the Court in determining whether Plaintiffs' proposed class meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as whether questions common to the class predominate in the suit and whether a class action is the superior method of resolving the claims. *See* Fed. R. Civ. P. 23(a), (b)(3). This will require the Court to analyze the similarities and differences between the various leases and royalty provisions therein that inform the class definition, how Southland currently calculates and pays royalties to the various proposed class members, and whether individual royalty payments can be adequately linked to specific lease agreements. It will also require the Court to analyze the method by which Plaintiffs have ascertained the putative class members. To the extent that information about the current and historical customs, practices, and usage of terms in the oil and gas industry will inform the Court's analysis of these and other certification issues, Ms. Terry's experience in the field of oil and gas

and consulting on and valuing oil and gas royalty payments qualifies her to offer her expert opinions in those areas.

### B. The Court will allow Ms. Terry's expert testimony and each of her proffered opinions at the class certification hearing.

Having found that Ms. Terry has ample experience to qualify her as an expert on pertinent issues regarding class certification, the Court must next assess the relevance and reliability of each of Ms. Terry's proffered opinions. The Court acknowledges at the outset that there are many factual issues in this case that are relevant to *both* class certification and the underlying merits of the case. The issues of law that are relevant at the class certification stage are those related to requirements laid out in Rule 23—whether the proposed class is so numerous that joinder would be impractical; whether there are questions of law and fact common to the class; whether the named plaintiffs' claims are typical of those of the proposed class, whether common questions predominate, etc. *See* Fed. R. Civ. P. 23(a), (b)(3). Put simply, Plaintiffs want to certify a class so that royalty recipients under the four types of lease provisions can argue for a ruling that Southland cannot deduct post-productions costs from their royalty payments. Southland argues that the four types of lease provisions and related royalty calculation methods vary too much, so a single decision from the Court could never determine whether it can deduct such costs from all royalty recipients.

To determine which view prevails, the Court must engage in at least some analysis of the relevant contract language at the class certification stage, even if such analysis is similar to how the Court will eventually review the contracts on the merits. In order to properly certify a class in oil and gas royalty litigation, the Court must "necessarily consider the royalty instruments involved and determine whether common questions predominate." *Abraham v. WPX Prod. Prods., LLC,*

184 F. Supp. 3d 1150, 1205 (D.N.M. 2016) (citing *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013)).

It is certainly true that expert witnesses may not usurp the Court's role by opining on conclusions of law. *See, e.g.*, *A.E. v. Indep. Sch. Dist. No. 25, of Adair Cty., Okla.*, 936 F.2d 472, 476 (10th Cir. 1991) ("an expert may not state legal conclusions drawn by applying the law to the facts"); *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) ("testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process"). Similarly, an expert witness is also prohibited from offering an opinion on how a contract should be interpreted as a matter of law. *See Am. Auto. Ins. Co. v. First Mercury Ins. Co.*, No. 13:CV-439 MCA/LF, 2017 WL 4410780, at *6 (D.N.M. Sept. 30, 2017) ("absent an ambiguity in the contract, interpretation of a contract is a matter of law to be conducted by the Court").

However, Ms. Terry's expert report does not suggest that she is usurping the Court's role by offering legal conclusions regarding the relevant Rule 23 requirements. *See* Fed. R. Civ. P. 23(a), (b)(3). (*See* also Doc. 113-6.) Even though her opinions *could* be useful in reaching a conclusion as to whether the four types of lease provisions are ambiguous and, if so, how they should be interpreted, Ms. Terry simply does not offer legal conclusions to that effect in her report. Further, the Court is not determining at this stage whether the lease provisions are ambiguous or what type of royalty payment method they require, so the fact that her opinions could also bear on those dispositive issues does not make them inadmissible in the class certification context.

Considering the historical development that informs common understanding of specific terms that appear in oil and gas leases will be helpful to the Court in assessing the commonality and predominance of the putative class members' claims and whether class certification is appropriate. (*See* Doc. 113-6 ¶¶ 33, 36.) An analysis of the underlying royalty instruments and

their potential similarities and differences in practice will also aid the Court in assessing the propriety of class certification. (*Id.* ¶¶ 41–49.) Ms. Terry's opinions involve facts that may also be relevant to interpreting the meaning of the underlying royalty provisions. Such overlap is unavoidable, but does not mean that every fact and opinion potentially implicating the meaning of the lease language is, as Plaintiffs argue, an impermissible legal conclusion "attempt[ing] to define the legal parameters in which the [factfinder] must exercise its fact-finding function." (*See* Doc. 130 at 5 (quoting *Zuchel v. City & Cty. of Denver, Colo.*, 997 F.2d 730, 742 (10th Cir. 1993) (alterations, internal quotation marks, and citations omitted)).) The Court thus finds that each of Ms. Terry's opinions are not impermissible conclusions of law and, as described in more detail below, are relevant in the context of class certification and reliably based on facts and data within the realm of her qualified expertise.

Opinion No. 1

Ms. Terry's first proffered opinion is that, at the time the named plaintiffs' leases were first entered into, "the custom and practice in the industry involved selling unprocessed gas at the well under contracts that established the standard for a marketable product and the basis for paying royalties." (*See* Doc. 113-6 at 11.) Thus, Ms. Terry opines, in leases that were first entered into in the 1950s, the phrase "proceeds from the sale of gas, as such" was the functional equivalent of providing for proceeds to be calculated "at the well." (*See id.* at 11–12.) Both named plaintiffs—Gerald Ulibarri and White River Royalties, LLC—hold lessor's interests in lease agreements with these "proceeds royalties provisions" that were entered into in the early 1950s. (*Id.*) Plaintiffs argue that this opinion impermissibly "purport[s] to express [Ms. Terry's] opinion as to the meaning of the 'proceeds royalty provisions . . . .'" (Doc. 113 at 4 (citation omitted).) Plaintiffs further argue that Opinion No. 1 "purports to rely on extrinsic evidence to contradict the unambiguous language

11

of the proceeds royalty provisions at issue, in direct contradiction to the governing New Mexico cannons [sic] of contract construction . . . ." (*Id.* at 5.)

The Court need not, at the class certification stage, delve into the canons of contract construction to determine whether the lease language itself is ambiguous and whether this opinion may be used to inform the factfinder's ultimate conclusions of law on the merits. The Court will reserve such analysis unless and until Southland proffers Ms. Terry's expert testimony in its argument on the merits that "proceeds royalty provisions" do not require producers to cover post-production costs without deducting them from royalty payments. Instead, as described above, Ms. Terry's testimony surrounding the history of oil and gas leasing in New Mexico and how historical circumstances, custom and practice, and usage of industry-specific terms have informed certain lease provisions and royalty calculations is relevant to helping the Court understand factual issues pertinent to its class certification determination. This information may help the Court decide whether "proceeds royalty provisions" are similar enough to the other three types of royalty provisions to make up a defined class, and possibly even whether "proceeds royalty provisions" drafted in the 1950s are similar enough to any identical provisions drafted and entered into after the oil and gas regulatory landscape changed. (*See* Doc. 113-6 ¶¶ 34–40.)

The correct interpretation of the provisions in regard to royalty payments and deductions is indeed a legal question at the heart of the merits of this case. The extent to which methods of royalty calculations between lease provisions vary based on their language, historical understanding, or practical application will bear on the strength of Plaintiffs' arguments that common questions of law and fact predominate among the putative class members and that their own claims are typical of those in the rest of the putative class. Commonality, typicality, and predominance are all questions of law that will be properly before the Court during the class

certification hearing. As such, the Court will benefit from Ms. Terry's expert testimony on the historical context of such leases and related royalty payments in New Mexico. *Accord Abraham*, 184 F. Supp. 3d at 1205 (admitting Ms. Terry's similar expert opinions at the class certification stage in an oil and gas royalty payment dispute because her testimony "provides information regarding certain royalty language's specialized meaning, which will assist the Court in determining whether that language is subject to different interpretations, and therefore, whether the Court can certify a class").[4]

There is no potential at the class certification hearing for a jury to be swayed or confused by the overlap between the merits and certification issues. However, the Court will bear in mind that Ms. Terry's testimony at the hearing should only address facts and topics relevant to the certification dispute, and Plaintiffs may object to her testimony at any time should it veer into legal conclusions or other inadmissible content. Similarly, Plaintiffs may again move to exclude Ms. Terry's expert testimony after the class certification stage, at which time many of their objections regarding legal conclusions and canons of construction would be more properly before the Court.

Opinion No. 2

Ms. Terry's second expert opinion is that "Southland's New Mexico leases listed in the Class Definition provide different royalty payment obligations and terms," and thus a uniform method of paying royalties cannot apply to all the proposed class members. (*See* Doc. 113-6 at 2). Plaintiffs object that this opinion "is inadmissible because it purports to opine on a question of law." (Doc. 113 at 6.) The Court finds that Opinion No. 2 is not a conclusion of law, but a series

---

[4] *Abraham* was not an identical case on the merits and involved a different proposed class definition that more broadly included "[a]ll present and former owners of royalty and overriding royalty which burden oil and gas leases and wells in the San Juan Basin of Colorado [and] New Mexico . . . ." 184 F. Supp. 3d at 1161 (quotation omitted). The proposed definition here is more narrowly tailored and includes only royalty recipients pursuant to leases that contain one of four specific royalty provisions. *See id.* Still, the Court finds that, like in *Abraham*, expert testimony on whether interpretation of these types of contract provisions could vary will still be useful in deciding whether the proposed class meets Rule 23 requirements.

13

of expert opinions based on factual observations about the relevant leases that are informed by Ms. Terry's decades of experience managing oil and gas marketing agreements and consulting on royalty issues. In her report, Ms. Terry analyzes each of the four types of royalty provisions included in the proposed class and opines that, in practice, they each require the calculation and payment of royalty provisions in different ways. (Doc. 113-6 ¶¶ 41–49.)

According to Ms. Terry, determining whether Southland has underpaid royalties to an individual or entity requires an analysis of the specific obligation under each lease and Southland's performance in each case. (*Id.* ¶ 42.) She supports this assertion by explaining the intricacies of each type of royalty provision included in the proposed class. (*See id.* at ¶¶ 44–49 (opining that the named plaintiffs' leases require royalty payments in line with prevailing custom in the 1950s; that "gross proceeds royalty provisions" are two-pronged provisions that require specific analysis of the marketing circumstances associated with production at each well, each month; that "greater of market value or gross proceeds" provisions are contemporary and payment amounts depend on what gas condition is considered "marketable" at various wells; and that "gross proceeds without deduction of post-production costs" provisions are modified versions of "gross proceeds" provisions, indicating that the royalties were specifically intended to be calculated differently than in "gross proceeds" leases.)

Southland characterizes this testimony as Ms. Terry "observ[ing] textual differences between the royalty provisions in the Subject Leases and offer[ing] an opinion as to the practical effect of these differences." (Doc. 130 at 8.) The Court agrees. Plaintiffs counter that "[c]opies of each of the four royalty provisions at issue have been provided to the Court[,]" and thus the Court can determine on its own whether "each of these four royalty provisions require the same royalty payment obligation by Southland." (*See* Doc. 134 at 6 (citation omitted).) Here, the Court must

disagree. Plaintiffs seem to be asking the Court to reach a legal conclusion on the merits just as they argue Ms. Terry is impermissibly doing. An analysis of the underlying lease language and industry-specific terms, supplemented by qualified expert opinions as to how such language is implemented in the industry based on Ms. Terry's experience, is relevant to helping the Court assess commonality, typicality, superiority, and predominance as it considers class certification.

Opinion No. 3

Ms. Terry's third expert opinion is that Plaintiffs' proffered expert, Donald Phend,[5] focuses solely on Southland's royalty payment methodology when he should be focusing on how to actually calculate whether individual royalty owners have been underpaid. (Doc. 113-6 ¶ 58). She asserts that the "Southland payment methodology is unlikely to be in dispute[,]" (*id.*), and that state courts have historically recognized that "the meaning of the royalty provision is informed, rightly so, by the actual production and marketing circumstances in place when the leases were executed." (*Id.* at ¶ 55.) Plaintiffs argue that this is a similarly "inadmissible opinion regarding the meaning of the four royalty provisions at issue." (Doc. 134 at 6.) Yet again, the Court finds that this opinion represents a blurred line between facts relevant to the merits of the case and facts relevant to class certification, but is not a conclusion of law regarding any of the class certification factors laid out in Rule 23 and should thus be admitted.

Ms. Terry and Mr. Phend are proffered as expert witnesses with different areas of expertise—Mr. Phend is an expert in oil and gas royalty accounting whose opinion addresses Southland's accounting methodology and alleged underpayments. (*See* Docs. 125; 140.) Ms. Terry's expert opinion, on the other hand, sheds light on the following question: if the Court found this accounting methodology to violate one or more of the contract provisions under which

---

[5] A separate motion conditionally moving to exclude Mr. Phend's testimony will be addressed by the Court in a subsequent ruling.

Southland pays royalties, would it violate *all* the royalty provisions included in the proposed class in a similar way? Ms. Terry's Opinion No. 3 states facts to suggest that a determination of whether the methodology is appropriate requires a case-by-case analysis, not a classwide analysis. (*See* Doc 113-6 ¶¶ 50–58.) Plaintiffs obviously disagree, but that does not change the fact that Ms. Terry's testimony is relevant for the Court to consider in deciding whether class certification is proper. The court is capable of assessing the weight of Ms. Terry's expert testimony as it relates to class certification issues, and Plaintiffs may attack its weight through rigorous cross-examination and argument at the class certification hearing.

Opinion No. 4

Finally, Ms. Terry opines that "[i]n as much as Plaintiffs have proposed to assert claims on behalf of some, but not all, of Southland's New Mexico royalty owners, they have not yet provided a means to identify the royalty owners included in the putative class." (Doc. 113-6 at 18.) This opinion comes the closest to improperly dictating to the Court what conclusions it must draw as to the ascertainability of the class. It is also the least relevant of Ms. Terry's opinions at this stage, as after Ms. Terry completed her report, Plaintiffs filed their motion for class certification, which elaborates on their methodology for ascertaining proposed class members in great detail. (*See* Docs. 105; 106.) Plaintiffs' memorandum supporting their motion for class certification even lists the names of individuals and entities it has identified so far by reviewing not only the relevant leases and chain of title pursuant to those leases, but also the names of past and current interest-holders that have received royalty payments from Southland since January 1, 2015. (*See* Doc. 106.)

Even in light of Plaintiffs' recently and more thoroughly articulated method of ascertaining putative class members, however, Ms. Terry's testimony does raise some factual issues that may be relevant to the Court in determining whether class certification is appropriate. First, she notes

16

that when Southland acquired its interest in production from New Mexico wells it "generally accepted the prior operator's division order pay 'decks' as being accurate and remitted royalties to the owners listed on that pay deck." (Doc. 113-6 ¶ 60.) She also opines that some of Southland's interests in New Mexico wells are "non-operated working interest[s]" under which third party operators produce and sell Southland's share of gas and remit all royalties on Southland's behalf. (*Id.* ¶¶ 61–62.) Ms. Terry also opines that Plaintiffs have not indicated how they will determine "working interest owners" that are excluded under the terms of the proposed class definition. (*Id.* ¶ 64.) Again, while Ms. Terry may not conclude broadly that "the class is not ascertainable," and this opinion certainly borders on such an impermissible conclusion of law, her opinions as to why it would be difficult to determine and exclude working interest owners is relevant to the Court's analysis of the Rule 23 factors.

The Court cannot determine from the language of the proposed class definition alone what makes one a "working interest owner," nor how such individuals and entities could be identified and excluded from the definition. Plaintiffs argue that "Ms. Terry has not provided any sufficient factual basis to support her opinion that Plaintiffs will not be able to sufficiently identify the members of the Class" and that she lacks sufficient expertise to offer such an opinion even if it were admissible. (Doc. 113 at 6–7.) Southland counters, correctly, that Ms. Terry's opinion is indeed based on facts: the fact that Southland had adopted prior operators' pay "decks" of royalty owners, the fact that some of Southland's oil and gas interests are "non-operated" interests; and the fact that Southland had not initially connected individual royalty recipients to the underlying leases. (*See* Doc. 113-6 ¶¶ 59–65.) The Court will not evaluate the weight of this testimony here, but finds that Ms. Terry's Opinion No. 4 clearly lays out assertions of fact based on her experience

and expertise in the oil and gas industry, and such testimony may be useful to the Court in determining the feasibility and superiority of ascertaining and certifying the proposed class.

## IV. Conclusion

Though the Court will deny Plaintiffs' motion to exclude the proffered expert testimony of Kris Terry (Doc. 113), it is sympathetic to Plaintiffs' concerns that Ms. Terry's testimony relevant to class certification will also be relevant to the underlying issue of how Plaintiffs' royalty payment provisions should be interpreted. The Court will thus carefully and conscientiously consider the weight of Ms. Terry's expert testimony only as it serves to assist in determining whether the proposed class meets requirements of numerosity, commonality, typicality, adequacy, predominance, superiority, and ascertainability under Rule 23. *See* Fed. R. Civ. P. 23(a), (b)(3). Ms. Terry may not make legal conclusions for the Court and may only present facts in the form of expert opinions that are within her scope of experience and expertise and are relevant to the Court's class certification decision. The Court finds that Ms. Terry's expert testimony as summarized in her expert report meets these requirements and limitations, but Plaintiffs can object during the class certification hearing if they believe Ms. Terry's testimony is straying from the narrow boundaries of permissible expert testimony on the class certificate issue.

**THEREFORE**,

**IT IS ORDERED** that Plaintiffs' Motion to Exclude All of the Proposed Opinion Testimony of Defendant's Expert Kris Terry (Doc. 113) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's Motion for Leave to File Surreply (Doc. 147) is **DENIED AS MOOT**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**