# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**GERALD ULIBARRI and**
**WHITE RIVER ROYALTIES, LLC,**

        Plaintiffs,

v.                                                                        **No: 1:16-cv-215-RB-JHR**

**SOUTHLAND ROYALTY COMPANY,**
**LLC,**

        Defendant.

## MEMORANDUM OPINION AND ORDER

The parties' cross-motions for summary judgment in this oil and gas royalty dispute center on a question of contract interpretation—does the phrase "the proceeds of the gas, as such" in a lease provision require royalty payments to be calculated on the value of natural gas when it first emerges from the wellhead? If so, Plaintiffs likely cannot sustain their claims that Defendant has been improperly calculating their payments. If such language is *not* synonymous with calculations "at the well," Plaintiffs' claims may proceed. There are numerous other legal issues at play in this case, but at this stage the Court need only determine whether the relevant lease language clearly contemplates royalty payments "at the well" or clearly contemplates payments at some other downstream valuation point where proceeds are actually generated. Having considered the submissions of counsel and relevant law, the Court finds that the language *clearly* contemplates neither. Thus, New Mexico law dictates that the ultimate interpretation of this ambiguous contract language should be left up to the finder of fact following the development of the record.

## I. Background

This case first reached the Court in March 2016, when Defendant Southland Royalty Company, LLC (Southland) removed Plaintiff Gerald Ulibarri's original class action complaint. (Doc. 1 (Compl.) at 1.) The original complaint alleged breach of contract, breach of implied duty

to market, and violations of the New Mexico Oil and Gas Proceeds Payment Act (OGPPA). (Doc. 1-1 ¶¶ 32–53.) The claims were based on allegations that Southland had been underpaying royalties to leaseholders by improperly deducting from their royalty payments proportionate shares of: (1) the New Mexico Natural Gas Processor's Tax, and (2) the post-production costs of processing and otherwise making natural gas marketable for sale. (*Id.* ¶¶ 16–31.) The matter was stayed pending the resolution of *Anderson Living Trust v. Energen Resources Corp.*, a Tenth Circuit case addressing nearly identical issues and many of the same lease agreements. *See* 879 F.3d 1088 (10th Cir. 2018), *amended and superseded on reh'g*, 886 F.3d 826 (10th Cir. 2018). (*See also* Doc. 30.) In early 2018, the Tenth Circuit resolved *Energen*, holding that production companies *can* pass along to leaseholders a proportionate share of the Natural Gas Processors Tax. 886 F.3d at 831. In addition, the court held that the "marketable condition rule" does not apply in New Mexico—meaning lessees *can* "deduct[] from [lessors'] royalty payments their proportionate share of post-production costs—those costs necessary to make the gas marketable." *Id.*

Following the *Energen* decision, Mr. Ulibarri twice amended his complaint. (*See* Docs. 41; 99.) The First Amended Complaint made two significant changes to the definition of the proposed class and his claims against Southland. (Doc. 41.) First, Mr. Ulibarri excluded from the putative class definition any individuals or entities whose lease agreements provide for royalty payments based on "market value at the well," "the prevailing field market price," or any other agreement language stating that value should be calculated "at the well." (*Id.* ¶ 1.) This change was based on his position that the Tenth Circuit's holding in *Energen* narrowly applies to only certain types of leases, and thus allows the deduction of post-production costs only insofar as that deduction is necessary to calculate the value of the gas "at the well." (*See* Doc. 37 at 2–3.)

2

As the Tenth Circuit explained in *Energen*, natural gas is often not marketable when it is first produced (i.e., "at the well"). *See* 886 F.3d at 832. Thus, when a lease agreement calls for royalties to be calculated based on the value of the gas at the well, producers must determine this value using a "netback" or "workback" method of calculation. *See id.* at 832–33. This involves calculating a price for the natural gas "at the well" by selling the natural gas after it has been processed into marketable condition, then deducting the post-production costs that were necessary to prepare it for sale to actually earn that value. *See id.* at 832 (explaining that the leases in *Energen* "set the basis for royalty payments as the 'market value at the well' or the 'prevailing field market price.' Determining those amounts, however, is not straightforward, because Energen does not sell the gas it produces on these leased properties 'at the well'" (citations omitted).) The First Amended Complaint thus asserts that while *Energen* allows the deduction of post-production costs when the lease requires calculating royalties "at the well," it is still improper to deduct post-production costs from royalties paid under all those leases that don't require calculations of value "at the well." (*See* Doc. 41 ¶¶ 7–26.) Instead, under those leases, Southland should base payments on the actual sales proceeds of the natural gas and related products derived from its wells. (*See id.*)

The Second Amended Class Action Complaint (Doc. 99 (2d Am. Compl.)) again revised the definition of the putative class and added White River Royalties, LLC (White River) as a named plaintiff. (*See id.* at 1.) Plaintiffs' proposed class includes any person to whom Southland has paid royalties since January 1, 2015, pursuant to a lease containing one of four different types of royalty payment provisions that Plaintiffs claim do *not* require calculations at the well.[1] (*See id.*

---

[1] A full description of each type of royalty provision is set forth in this Court's January 2, 2019 Memorandum Opinion and Order granting Plaintiffs' motion to amend their complaint. (Doc. 97 at 4–5.) The Court incorporates by reference that overview of the relevant royalty provisions, noting that it will take up the question of whether this proposed class meets the requirements of Federal Rule of Civil Procedure 23 at a separate hearing on Plaintiffs' motion for class certification. (*See* Doc. 105.)

¶ 1.) Plaintiffs Ulibarri and White River hold lessor's interests in natural gas leases with Southland that contain identical "Proceeds Royalty Provisions," (*id.* ¶¶ 11, 13–15), which require payment of "a specified percentage of the proceeds of the gas, as such, for gas from wells where gas only is found." (*Id.* ¶ 1 (quotation marks omitted).) Thus, only Proceeds Royalty Provisions are relevant to the parties' cross-motions for summary judgment on the lease interpretation issue.

Southland argues that such language "unambiguously provides that Plaintiffs are entitled to the value of the gas at the well, which is the amount actually received by Southland for the sale of the gas, less a proportionate share of costs incurred after the gas is brought to the surface at the well[.]" (Doc. 124 at 10 (capitalization altered).) To support this interpretation, Southland points to dictionary definitions of the term "proceeds" and the phrase "as such" (*see id.* at 10–13), as well as caselaw illustrating that the phrase "'the gas, as such' in the Proceeds Royalty Provision means the exact gas that is produced by Southland at the wellhead." (*Id.* at 13.) Southland also offers expert witness testimony opining that "[i]n 1953 and 1955, when Plaintiffs' predecessors in interest entered into the Subject Leases, gas produced from the pertinent wells would have been sold at the wellhead." (*Id.* at 18.)

Plaintiffs, on the other hand, argue that "pursuant to the plain language of the Proceeds Royalty Provision, Southland [is] required to pay Plaintiffs royalties based upon proceeds received on the sale of the natural gas products which it sold to third party purchasers" not at the well but "at the tailgate of the applicable processing plant." (Doc. 168 at 18.) Plaintiffs point out that the relevant language includes no references to "the well," "market value," or "net proceeds" which would allow for the deduction of processing costs, and instead directs such payments to be calculated solely based on proceeds. (*Id.* at 18–20.)

Further, Plaintiffs argue, the proffered testimony of Defendant's expert witness Kris Terry is inadmissible because she opines on the meaning of the phrase "as such" solely to change the terms of an unambiguous contract after the fact and her opinions are not based on a reliable foundation. (*Id.* at 22–23.) Plaintiffs seek partial summary judgment on their claims for breach of contract and violation of the OGPPA, arguing that the leases' plain language and relevant caselaw dictate that "Southland is required to pay royalties based on the proceeds received on the sale of residue gas and natural gas liquids to third party purchasers." (*Id.* at 17.)

In addition to the issue of whether Proceeds Royalty Provisions require valuation at the well, Southland's motion for summary judgment raises two additional arguments: (1) that "Plaintiffs may not bring claims under the New Mexico Oil and Gas Proceeds Payment Act because it does not apply retrospectively to the subject leases" (Doc. 124 at 22 (capitalization altered)); and (2) that any suggestion in the Second Amended Complaint that the putative class should include overriding royalty interest owners cannot be sustained because overriding royalty interests arise "through a subsequent conveyance instrument by a lessee, acting as assignor[,]" and are thus not governed by the underlying leases (*id.* at 24–25).

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for

either party. *Id*. The moving party bears the initial responsibility of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citation and quotation marks omitted).

### B. Oil and Gas Lease Interpretation

"In New Mexico, oil and gas leases are interpreted under the same principles as any other contract." *King v. Estate of Gilbreath*, 215 F. Supp. 3d 1149, 1164 (D.N.M. 2016) (citing *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2013); *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 858 P.2d 66, 80 (N.M. 1993); *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1112 (10th Cir. 2005)). "The primary objective in construing a contract is to ascertain the intention of the parties[,]" *Continental Potash, Inc.*, 858 P.2d at 80 (quoting *Mobile Inv'rs v. Spratte*, 605 P.2d 1151, 1152 (N.M. 1980)), and "oil and gas leases must be construed to give effect to all of their provisions so far as possible." *Owens v. Superior Oil Co.*, 730 P.2d 458, 460 (N.M. 1986) (citations omitted).

When a contractual provision is in dispute, courts must first determine if the provision is ambiguous. "If a court concludes that there is no ambiguity, the words of the contract are to be given their ordinary and usual meaning[,]" *Lyons*, 299 P.3d at 852 (quotation omitted), and the court "is limited to interpreting the contract which the parties made for themselves [as a court] may not alter or make a new agreement for the parties." *King*, 215 F. Supp. 3d at 1164 (quoting *Lyons*, 299 P.3d at 852). When contractual language *is* ambiguous, "the jury (or the court as the

fact finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact before deciding issues of breach and damages." *C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 243 (N.M. 1991) (citation omitted).

"Whether a contract contains an ambiguity is a matter of law . . . ." *Lyons*, 299 P.3d at 852. "A contract term may be ambiguous if it is 'reasonably and fairly susceptible [to] different constructions.'" *Id.* (quoting *Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1235 (N.M. 1993)). "The standard to be applied in determining whether a contract term is ambiguous and is subject to equally logical but conflicting interpretations is the same standard applied in a motion for summary judgment." *Id.* at 849 (quoting *Randles v. Hanson*, 258 P.3d 1154, 1162 (N.M. 2001) (quotation marks and brackets omitted)). Thus, a court should only consider a provision unambiguous "when the 'evidence presented is so plain' that it is only reasonably open to one interpretation." *Id.* (quoting *Randles*, 258 P.3d at 1162). In making this determination, "courts may consider 'evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.'" *Id.* (quoting *C.R. Anthony Co.*, 817 P.2d at 242–43). "[I]f the proffered evidence of surrounding facts and circumstances is in dispute, turns on witness credibility, or is susceptible of conflicting inferences, the meaning must be resolved by the appropriate fact-finder . . . ." *Id.* (quoting *Mark V*, 845 P.2d at 1235).

**III. Analysis**

**A. The language in Proceeds Royalty Provisions is ambiguous.**

The Court concludes that the Proceeds Royalty Provisions contained in Plaintiffs' leases are ambiguous as a matter of law regarding the point of valuation, and thus the Court will deny both parties' motions for summary judgment on this issue. The circumstances surrounding the negotiation of the contracts in the 1950s and the meaning at that time of relevant terms like

7

"proceeds" and "as such" are critically important to the determination of whether the contract dictates that royalty payments should be calculated at the well or at a downstream point of sale. *See id.* However, as described below, the evidence presented by both parties in support of their respective positions is "in dispute, turns on witness credibility, [and] is susceptible of conflicting inferences . . . ." *See Mark V*, 845 P.2d at 1235. Thus, the Court finds that the language is ambiguous as a matter of law.

### i. The plain language is susceptible to conflicting inferences.

Under Plaintiffs' leases, royalty payments are to be made as "*a specified percentage of the proceeds of the gas, as such, for gas from wells where gas only is found.*" (2d Am. Compl. ¶ 1.) Considering this language on its face, these provisions certainly do not "unambiguously provide[] that Plaintiffs are entitled to the value of the gas at the well," as Southland argues. (*See* Doc. 124 at 10 (capitalization altered).) Indeed, the only reference to "wells" is to specify that the provision refers to royalties on gas produced from gas-only wells, as opposed to the natural gas that is sometimes produced from oil wells. Still, the language also fails to unambiguously provide, as Plaintiffs argue, that "Southland is required to pay royalties based on the proceeds received on the sale of residue gas and natural gas liquids to third party purchasers." (*See* Doc. 168 at 17.)

Proceeds Royalty Provisions are more vague than the other three types of royalty provisions set forth in the putative class description. While the mere use of the word "proceeds" without further specification could indeed be logically read to mean the actual proceeds realized the first time the gas is sold, the phrase "gas, *as such*," does seem to indicate some particular state or condition of that gas. It is quite possible that "gas, as such" could refer to unprocessed gas at the wellhead. But the Court is not familiar with the particular meaning of the term "as such," if any, in the oil and gas industry and finds both interpretations equally plausible. Southland's

statement that "as such" has been "defined by some to mean 'using the exact meaning of the word or phrase,' . . . and by others 'as being what is indicated or suggested,'" is thus patently unhelpful. (Doc. 124 at 12–13 (citing Cambridge Dictionary; Collins English Dictionary) (web links omitted).) Considering the plain meaning of the language, Proceeds Royalty Provisions are "susceptible of conflicting inferences." *See Mark V*, 845 P.2d at 1235.

### ii. Caselaw provides no binding guidance.

No New Mexico court has interpreted the phrase "gas, as such" in the context of a natural gas lease, nor has the Tenth Circuit. Several non-binding cases, however, are relevant to the question of whether, in the mid-20th century when Plaintiffs' predecessors in interest executed the relevant leases, the phrase "gas, as such" referred to gas sold and valued at the wellhead. In *Matzen v. Hugoton Production Co.*, the Kansas Supreme Court considered the proper method of calculating royalty payments under Proceeds Royalty Provisions[2] in a case where both parties had already agreed "that Hugoton's royalty obligation [was] to be determined at the wellhead rather than at the point of sale and delivery off the lease . . . ." 321 P.2d 576, 580 (Kan. 1958).

Though point of valuation was not in dispute, the court noted that in Grant County, Kansas in 1941 "[w]hen plaintiffs' leases were executed it was the established custom and practice in the field to measure, determine the price, and pay royalty at the wellhead for gas produced. Pipe-line facilities did not exist and there was no general market for gas in the area." *Id.* at 581–82. *See also Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 875 (Tex. Civ. App. 1962) ("[a] distinction . . . must be applied between the status of natural gas, as such, and 'extraneous gas[,]' . . . which means gas which has been produced elsewhere" and is no longer in its "natural state."); *Anderson*

---

[2] None of the cases cited in this section actually used the label "Proceeds Royalty Provisions," but the Court will continue to use this shorthand when referring to leases that included language dictating that royalty payments should be made on "proceeds from the sale of the gas, as such, for gas from wells where gas only is found."

9

*Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 341 (D.N.M. 2015) (finding tentatively for class certification purposes that "[i]n some quarters of the oil-and-gas industry, the term 'as such,' when used with reference to royalty based on 'proceeds derived from the sale of gas, as such,' means from the sale of the gas in the condition that it is as it emerges from the well.").

In *Barby v. Cabot Corp.*, the Tenth Circuit examined various lease provisions, including Proceeds Royalty Provisions, and concluded that "royalties were to be paid on all gas marketed at the wellhead, or if marketed off the premises, royalties on the market value at the well." 465 F.2d 11, 13 (10th Cir. 1972). The plaintiffs had conceded, however, "that under the leases the royalties are to be paid on the basis of the market value of the gas at the well." *Id.* at 14. Furthermore, the defendant lessee contracted with a third-party to sell the gas at the wellhead—so the case actually involved a wellhead market for gas. *Id.* at 15. *See also Lightcap v. Mobil Oil Corp.*, 562 P.2d 1, 9, 11 (Kan. 1977) (holding that under Proceeds Royalty Provisions "royalties . . . are to be paid on amounts actually received and lawfully retained by the producer[,]" but also noting that "all sales by the producer were made at the wellhead").

In 2012, a United States Magistrate Judge in Utah considered various oil and gas leases that had been executed between 1952 and 1982 to determine whether royalties should be calculated at the wellhead or some other downstream point. *Emery Resource Holdings, LLC v. Coastal Plains Energy, Inc.*, 915 F. Supp. 2d 1231, 1233–35. (D. Utah 2012). The court reasoned that, though the leases containing Proceeds Royalty Provisions were less clear than those containing other types of royalty language, "the qualifying phrase 'as such, for gas from wells where gas only is found' can be reasonably and fairly construed to mean the sale of the gas 'as such' or, in other words, in the condition in which the gas is found when produced 'from' the wells." *Id.* at 1238. The Court reached this conclusion by "attempt[ing] to harmonize all of the contract's provisions and all of

its terms . . ." and concluding that the parties "could not have reasonably intended . . . the Subject Leases [to be] left without a defined royalty valuation point or with a royalty valuation point that can change over time." *Id.* at 1241–42.

Additional non-binding caselaw, on the other hand, suggests that identical lease provisions are much more ambiguous when it comes to the point at which royalty payments should be calculated. *Ladd v. Upham* offers the most support for Plaintiffs' position that the lease language unambiguously refers to actual proceeds at whatever point they are earned, rather than a wellhead calculation. 58 S.W.2d 1037 (Tex. Civ. App. 1933), *aff'd*, 95 S.W.2d 365 (Tex. Comm'n App. 1936). In *Ladd*, the relevant lease was executed in 1929, and included a Proceeds Royalty Provision. *Id.* at 1038. *Id.* The court held that:

> The lessee under the terms of the lease was given full power and control of the entire production and if in order to obtain a better price for the gas he chose to construct pipe lines or otherwise convey it to a point or points beyond the lease and thus receive greater profit, he could do so but could not escape the obligation in favor of the lessor imposed by the terms of the lease. . . . Unlike leases of a familiar form, there was no reservation of title to gas produced from the well but full right and power of disposition thereto was vested in the lessee . . . .

*Id.* at 1038–39.

Three years later, however, the Texas Commission of Appeals affirmed the lower court's decision to allow the case to proceed to trial, but walked back the significance of its lease interpretation by "pretermit[ting] any discussion of the provisions of the contract in advance of a trial on the merits." *Upham v. Ladd*, 95 S.W.2d at 366. The Commission of Appeals explained that "it [was] not possible in the present state of the record to construe the lease contract sued upon unaided by pleading and proof defensively of the surrounding facts and circumstances attending its execution." *Id.* This holding illustrates the court's discomfort with analyzing a Proceeds Royalty

11

Provision without any extrinsic evidence regarding the execution of the contract or the typical usage and custom at the time the parties entered into the lease.

Other cases further support the conclusion that Proceeds Royalty Provisions are susceptible to multiple interpretations. *West v. Alpar Resources, Inc.*, 298 N.W.2d 484, 485–86, 490 (N.D. 1980) (finding a Proceeds Royalty Provision ambiguous because it "simply provides that the lessor is entitled to receive 'one-eighth of the proceeds from the sale of the gas' without further explanation[,]" and noting that "[r]ational arguments can . . . be made to support the view that the royalty obligation is to be determined at the wellhead as well as to support the view that the royalty obligation is to be determined at the location of the sale of the gas."); *Foster v. Merit Energy Co.*, 282 F.R.D. 541, 557 (W.D. Okla. 2012) (reasoning in the class certification context that the plaintiff's "royalty clause specifie[d] no geographic point of valuation for 'gas, as such, for gas from wells where gas only is found.'").

### iii.  The facts drawn from Ms. Terry's expert report are genuinely disputed.

Neither the plain language of the Proceeds Royalty Provisions nor caselaw interpreting identical lease provisions sufficiently proves that either party's preferred interpretation is "so plain that it is only reasonably open to one interpretation." *ConocoPhillips Co.*, 299 P.3d at 849 (citation and quotation marks omitted). However, Southland offers Ms. Terry's expert opinions as evidence of "relevant usage of trade, course of dealing, and course of performance" that has the potential to prove Southland's interpretation correct. *See Loretto Mall Partners*, 817 P.2d at 242–43.

For example, Ms. Terry opines that when Plaintiffs' leases were executed in the 1950s, "[t]he historical record for the San Juan Basin[,]" where Plaintiffs' leases are located, "reveals that virtually all sales of gas occurred at or near the wellhead . . . ."  (Doc. 124-1 ¶ 21.) And, further, that "many leases used terms such as 'proceeds, if sold at the well' or 'proceeds on the sale of gas

12

as such,' which were functionally equivalent due to predominantly wellhead sales." (*Id.* ¶ 27.) Ms. Terry also opines that "[i]n the 1950s, the natural gas produced from Plaintiffs' leaseholds would have been sold at the physical location of the wellhead, because [Southland's predecessor in interest] Stanolind did not own any processing plant or other facilities to sell gas downstream from the physical location of the wellhead." (*Id.* ¶ 35.)

Plaintiffs, however, vehemently object to these facts as stated by Ms. Terry, disputing all of Southland's material facts that are based on Ms. Terry's opinions and arguing that they are inadmissible because, among other things, "there is no adequate foundation for Ms. Terry's . . . opinions." (Doc. 168 at 3–8.) Plaintiffs argue that these opinions are not reliable because "there are no documents identified in [her] report which would support such opinions, no explanation of what method, if any, was applied to reach such opinions, and no identification of any persons who might support such opinions." (*Id.* at 23.) Nor, according to Plaintiffs, "is there any proof that the words 'as such' had a particular meaning for the original lessees . . . ." (*Id.*) Plaintiffs also argue that the original lessors were not employed in the oil and gas industry and thus would have no reason to know the meaning of any common industry terms. (*Id.* at 21–22.)

The Court concludes that, while Ms. Terry is qualified as an expert in this case, Southland has failed to show that the opinions contained in her report are reliable and relevant enough to render them genuinely undisputed for purposes of summary judgment. This Court indeed determined that "Ms. Terry is qualified to offer her opinions on the customs and practices, usage of terms, and historical context and circumstances in the oil and gas industry that have developed to shape common understanding of oil and gas agreements." (*See* Doc. 151 at 7–8.) However, the Court also explained in that Opinion that it "need not, at the class certification stage, delve into the canons of contract construction to determine whether the lease language itself is ambiguous and whether [her] opinion[s] may be used to inform the factfinder's ultimate conclusions of law on the

merits." (*Id.* at 12.) With its motion for summary judgment, Southland is now offering Ms. Terry's expert opinions as evidence that the contract language in the Proceeds Royalty Provisions unambiguously proves that its "at the well" interpretation is correct. (*See* Doc. 124 at 3–6.) The credibility and weight of Ms. Terry's testimony play a much more important role at this stage, and the Court simply cannot rely on the expert report and its sparse citations alone to hold that the contract language is unambiguous.

Ms. Terry's affidavit states that she "examined documents, records, and data that relate to operations and gas production during the relevant time period by Southland and its predecessors in interest pursuant to the leases at issue in this litigation." (*See* Doc. 124-1 ¶ 4.) She also notes that she applied her "personal knowledge and utilized historical sources in analyzing and opining on the circumstances existing as between lessees and lessors in the San Juan Basin in the 1950s, as well as the customs and practices of the oil and gas industry in the San Juan Basin during the relevant time period(s)." (*Id.*) Yet in making the sweeping statements described above in her report, Ms. Terry cites very few elements of the "historical record" upon which she apparently relied. (*See generally* Doc. 124-1.)

Simply put, the finder of fact will need more information to determine how much weight to give Ms. Terry's opinions before ultimately interpreting the lease language. The standard for determining that a contract provision is unambiguous, like that of summary judgment, is that "no reasonable person would determine the issue before the court in any way but one." *C.R. Anthony Co.*, 817 P.2d at 244. Here, "the proffered evidence is in dispute, turns on witness credibility, [and] is susceptible of conflicting inferences . . . ." *Id.* Thus, the correct interpretation of the leases can only be resolved following further evidentiary development, which may include cross examination to elucidate the basis and weight of Ms. Terry's opinions. *See Loretto Mall Partners*, 817 P.2d at

244; *see also Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) ("[i]t is within the discretion of the trial court to determine how to perform its gatekeeping function . . . so long as the court has sufficient evidence to perform the task of ensuring reliability and relevance") (quotations omitted). Discovery regarding class certification has been bifurcated from discovery on the merits in this case (*see* Docs. 44; 47), so both parties will have an opportunity to further develop the record on the issue of how the ambiguous lease language should be interpreted. The Court will deny both parties' motions for summary judgment on this issue.

### B. The Court will deny summary judgment on Southland's claim that the OGPPA does not apply to the subject leases.

Southland next seeks summary judgment on Plaintiffs' claim for relief pursuant to the OGPPA, arguing that "[u]nder the general rule in New Mexico, statutes, including the OGPPA, do not apply retrospectively." (Doc. 124 at 22 (citing NMSA 1978, § 12-2A-8 (1997); *Sw. Distr. Co. v. Olympia Brewing Co.*, 565 P.2d 1019 (1977)).) Because Plaintiffs' leases were executed decades before the OGPPA was enacted in 1985, Southland argues, "and because [the OGPPA] imposes new substantive rights and obligations on Southland, it should not be applied retrospectively" and Plaintiffs' claim under the OGPPA should be dismissed. (*Id.* at 23–24.) Plaintiffs counter that "[t]here is no provision in the Act which states, or suggests, that the application of the Act should be limited only to payments of proceeds which have been made under leases which are executed after the Act was enacted." (Doc. 168 at 24.)

"The [OGPPA] sets forth a derivative remedy that the New Mexico Legislature provides to oil-and-gas royalty owners[,]" but "[i]t will not lie absent a demonstration of a lessee's breach of an underlying agreement with, or duty to, an interest owner." *WPX Energy*, 306 F.R.D. at 434–35 (citing *Elliott*, 407 F.3d at 1120). "The [OGPPA] provides a specific time frame in which lessees on oil-and-gas [leases] must pay royalty interest owners for proceeds they receive[,]"

15

generally within six months of the first sale and no later than forty-five days after the payor receives payment for production. *Id.* at 435 (citing N.M. Stat. Ann. § 70-10-3). "Working interest owners who fail to make payments within § 70-10-3's timeframe incur eighteen-percent interest on the 'unpaid balance due,' unless one of the four exceptions in § 70-10-5 applies . . . ." *Id.* (citing N.M. Stat. Ann. § 70-10-5).

Plaintiffs bring their OGPPA claim pursuant to § 70-10-5, asserting that since January 1, 2015, "Southland has failed to pay the full amount of royalties owed to Plaintiffs . . . within the time period designated in the Royalty Agreement, or within forty-five days after the end of the month in which the sale proceeds on the sale of such gas to third party purchasers has been received." (2d Am. Compl. ¶ 45.) Thus, "[p]ursuant to N.M.S.A. 1978 § 70-10-5, Plaintiffs and the Class members should be awarded all of the underpaid royalty amounts, together with prejudgment interest at the rate of eighteen percent per year, from the date of each royalty underpayment through the date of final judgment. (*Id.* ¶ 46.)

Southland's argument that this provision of the OGPPA does not apply retroactively to Plaintiffs' leases relies heavily on *King v. Estate of Gilbreath*, No. CV 13-862 JCH/LAM, 2016 WL 7496096, at *5 (D.N.M. Mar. 30, 2016). In *King*, United States District Judge Judith Herrera denied summary judgment in a similar dispute, reasoning that "Plaintiffs have not persuaded the Court that the New Mexico Supreme Court would conclude that the OGPPA applies retrospectively." *Id.* In that case, however, the relevant lease had been executed in 1972, the lease was assigned to the current lessee *prior* to the enactment of the OGPPA, the lease itself terminated in 1990, and the specific OGPPA amendments creating the substantive rights underlying the plaintiffs' claims had not been enacted until 1991. *Id.* In light of the specific facts in *King*, Judge Herrera correctly concluded that "it does not appear that the OGPPA was intended to apply under

16

the circumstances of this case." *Id.* Southland points out, however, that the court went on to note that "Plaintiffs fail[ed] to persuade the Court that the New Mexico Supreme Court would hold that the OGPPA applied retrospectively to a Lease and assignment executed before the effective date of the OGPPA." *Id.* (*See also* Doc. 124 at 22–23.)

*King* does not necessarily stand for the proposition that any and all royalty payments made pursuant to a contract originally executed before 1985 are exempt from the OGPPA. In *King*, it was quite reasonable to apply New Mexico's general rule of non-retroactivity when the lease had terminated prior to the enactment of the relevant statutory amendments and both the execution of the underlying lease and its assignment to the current lessee preceded enactment of the OGPPA itself. *See King,* 2016 WL 7496096, at *5. Here, however, Plaintiffs' underlying leases were executed in the 1950s but assigned to Southland in early 2015. (*See* Doc. 168-8 at 27:21–28:4.) It seems quite reasonable to the Court that, when the contracts were assigned to a new lessee decades after the enactment of the OGPPA, the statute's substantive requirements regarding timeliness of royalty payments would apply to that agreement.

The OGPPA had been established law for decades when Southland acquired its interest in the leases, so applying the Act's payment requirements would not "impose significant new duties and conditions and take away previously existing rights." *See Olympia Brewing Co.*, 565 P.2d at 1025; *see also King*, 2016 WL 7496096, at *5 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) ("stating that presumption against statutory retroactivity is based on the unfairness that results when new burdens are placed on persons after the fact")). Indeed, Judge Herrera's holding appears to be narrower than Southland admits, as she was not persuaded "that the New Mexico Supreme Court would hold that the OGPPA applied retrospectively to a Lease *and assignment* executed before the effective date of the OGPPA." *Id.* (emphasis added).

17

It is unlikely that the New Mexico legislature intended to exempt all royalty payments from the Act's protections if those payments could be traced back to a contract predating 1985, particularly in light of the fact that the New Mexico Supreme Court has acknowledged that the language of the OGPPA reveals a "strong public policy in favor of establishing the rights of interest owners." *See First Baptist Church of Roswell v. Yates Petroleum Corp.*, 345 P.3d 310, 314 (N.M. 2015). Many interest owners, like Plaintiffs, derive their interests from leases that were originally executed long before enactment of the OGPPA. For example, in *Anderson Living Trust v. Energen*, the Tenth Circuit remanded the plaintiffs' timely payment claim under the OGPPA to the district court after finding that "the issue deserves clear resolution." *See* 886 F.3d at 851. Though it does not appear that the defendant in that case made a retroactivity argument, the Tenth Circuit noted that many of the subject leases at issue were "quite old," *id.* at 830, and a review of the underlying complaint reveals that each subject lease was executed prior to enactment of the OGPPA. *See Anderson Living Tr. v. Energen Res. Corp.*, 13cv909, (Doc. 1) (D.N.M. Sept. 20, 2013). The Tenth Circuit's decision thus implies that the OGPPA may apply to leases executed before 1985. The Court will deny Southland's motion for summary judgment on this issue.

**C. The Court will grant summary judgment as to overriding royalty interests.**

Finally, Southland urges the Court to rule "that royalties paid to owners of overriding royalty interests are governed by the overriding royalty provisions contained in the instrument that created each overriding royalty interest, and not the royalty provisions of the underlying oil and gas lease(s)." (Doc. 124 at 27.) Plaintiffs largely fail to respond to this claim, merely stating that "[n]either Ulibarri nor White River . . . have alleged any claim against Southland for breach of any overriding royalty agreement[,]" so "Southland's arguments regarding this non-existent claim should therefore be disregarded." (Doc. 168 at 3.)

Plaintiffs fail to acknowledge, however, that their operative complaint currently includes in the putative class "all persons and entities to whom Southland has paid royalties on natural gas . . . pursuant to leases *or overriding royalty agreements* (collectively, "Royalty Agreements") which contain a royalty provision obligating Southland to pay royalties based on" one of the four types of lease provisions. (2d Am. Compl. ¶ 1 (emphasis added.) Based on the plain language of the complaint, the Court concludes that overriding interest owners would only be included in the putative class if the instrument that created their overriding interest (not the underlying lease) contains any of the four royalty provisions at issue in this case. (2d Am. Compl. ¶ 1.) Still, to the extent that Plaintiffs make any claim or argument to the contrary, the Court finds that Plaintiffs have abandoned this claim and will grant summary judgment in Southland's favor as to any claim that payments to overriding royalty interest owners are governed by royalty provisions in the underlying lease. *See Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992) (affirming summary judgment on a claim abandoned in summary judgment briefing).

**THEREFORE**,

**IT IS ORDERED** that Southland's Motion for Summary Judgment No. 1 (Doc. 124) is **GRANTED** as to Plaintiffs' claims regarding overriding royalty owners and **DENIED** as to all other claims;

**IT IS FURTHER ORDERED** that Plaintiffs' Cross-Motion for Partial Summary Judgment (Doc. 167) is **DENIED**.

_____
**ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE**